IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE:<br><br>Donald R. Triplett, Jr.,<br><br>    Debtor.<br><br>Shawn Valk and Ron Valk, as Assignees<br>of Estate Claims of Donald R. Tripplett, Jr.,<br><br>    Plaintiffs,<br><br>v.<br><br>Jose S. Escoffie,<br><br>    Defendant. | Case No. 19-42570<br>(Chapter 7)<br><br><br><br><br><br><br><br>Adv. Proc. No. 21-4108 |

## MEMORANDUM OPINION

On December 7, 2022, this Court conducted a trial on the "Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 548 and 550" filed by Shawn and Ron Valk (collectively, the "**Plaintiffs**" or the "**Valks**"), as assignees of the claims of Donald R. Triplett, Jr.'s bankruptcy estate, against Jose S. Escoffie (the "**Defendant**" or "**Escoffie**"). The Plaintiffs seek to establish that Triplett made eleven transfers to the Defendant totaling $6,568.85 with the constructive intent to defraud under 11 U.S.C. § 548(a)(1)(B).[1] The Court took this matter under advisement at the conclusion of the trial to prepare a detailed written ruling. The Court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (H) and (O). This Memorandum

---

[1] The Plaintiffs' complaint asserted claims for actual and constructive fraud under § 548 of the Bankruptcy Code. The Plaintiffs stated at trial that they were proceeding only on their constructive fraud claim.

1

Opinion embodies the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052.[2]

## RELEVANT FACTUAL BACKGROUND

### The Debtor's Relationship with Escoffie

1.  Prior to bankruptcy, Donald R. Triplett (the "**Debtor**") was in the business of commercial and residential construction, remodeling, and design.

2.  The Debtor engaged in business using the name "Preferred Platinum Construction," among other business names.

3.  The Debtor is married to Jose Doniceth "Doni" Escoffie. Jose Escoffie is a relative of the Debtor's husband. The Debtor has raised Escoffie since Escoffie was ten or eleven years old. The Debtor refers to Escoffie as his son or stepson.

4.  The Debtor made eleven transfers to Escoffie in the total amount of $6,568.85 from March 2018 through June 2018. The Debtor made these transfers from an account he held for doing business as "Preferred Platinum Construction."

5.  The Debtor was the only witness who testified at trial.

6.  The Debtor testified that he sometimes loaned money to Escoffie. He also testified that Escoffie worked on construction projects for him from March 2018 through June 2018 and that Escoffie sometimes used his own funds to buy materials for the projects.

7.  The Debtor testified, credibly, that he personally knew Escoffie worked as a laborer on construction projects for him. The Debtor identified specific construction projects related to 10 of the 11 transfers to Escoffie. According to the Debtor, one of the 10 transfers (for $699.90)

---

[2] To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such. Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

2

included a "cash advance" as well as payments for labor and materials. And the Debtor identified one transfer (for $250.00) as a "bonus" for a particular project. The Debtor testified, credibly, that Escoffie had repaid any and all loans the Debtor had made to him over the years.

8. The Debtor testified that he was "typically" able to pay his personal debts as they came due but admitted that "things got tight" on occasions when he did not receive prompt payment for his construction work. He testified that he could not recall any of the specifics of various lawsuits brought against him by creditors in the years prior to bankruptcy except he did recall that several of the cases were dismissed.

## The Debtor's Bankruptcy Case

9. The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 19, 2019.

10. The Debtor owned a home when he filed for bankruptcy, which he valued at $225,000. The Debtor reported less than $50 in several checking accounts and no interest in any retirement or investment accounts on his petition date.

11. In his "Statement of Financial Affairs" ("**SOFA**"), the Debtor identified numerous legal actions in which he was a party in the year preceding bankruptcy. The litigation included several lawsuits by and against the Debtor, Ron Valk, Shawn Valk and the Valks' business, Platinum Construction (which is distinct from the Debtor's similarly named business, Preferred Platinum Construction). The litigation also included two lawsuits brought against the Debtor by Jeremy Haltom. In addition, the Debtor and Ron Valk's son, Shawn Valk, were engaged in litigation regarding their respective interests in TV Arrowhead, LLC ("**TV Arrowhead**").

12. The Debtor exempted his home and household items from his creditors. His primary non-exempt assets were his claims against the Valks and Valk-related entities and his interest in TV Arrowhead.

13. In his "Schedule A/B: Property," the Debtor stated that Ron Valk owed him an unknown amount of money. The Debtor described Ron Valk's alleged debt to him as follows:

> Platinum Construction Ron Valk owes debtor for multiple projects completed for him. They have liens on them. He also owes me for product he stole. As well as money for construction work completed on his personal home and office. All subject to ongoing law suits. Also owed 10% if [sic] backend profit on two commercial building sales.

14. In his "Schedule A/B: Property," the Debtor listed the following accounts receivable in the total amount of $221,061 owed to him by Ron Valk:

> Ronald Valk- Platinum Construction Maple $77,000
> Ronald Valk- Platinum Construction Locus Grove $54,061.00
> Ronald Valk Personal $30,000.00
> Ronald Valk Saro LLC $60,000.00

15. In his "Schedule A/B: Property," the Debtor stated that he had a 50% interest in TV Arrowhead, which he valued at $325,000.

16. According to documents filed in the Debtor's bankruptcy case, Shawn Valk and the Debtor were managing members of TV Arrowhead, whose only asset was a lake house. A dispute arose between the Debtor and Shawn Valk regarding the allocation of capital contributions to TV Arrowhead, and Valk sued the Debtor, seeking to wind up the business in 2018.

17. The state court approved a sale of the lake house for $625,000, and the sale was set to close on September 20, 2019. The day before the closing, the Debtor filed a bankruptcy petition.

18. Shawn Valk promptly moved for relief from the automatic stay so the sale could proceed. This Court granted the motion.[3]

19. In his "Schedule E/F: Creditors Who Have Unsecured Claims," the Debtor listed a total of $3,128,635.86 in liabilities. His undisputed debts included a priority claim for debt owed to the Internal Revenue Service ("**IRS**") in the estimated amount of $160,000. The IRS filed a proof of claim in the total amount of $173,413.61 for taxes due for tax years 2006, 2007, 2008, 2010, 2011, 2014, 2017 and 2018.

20. The Debtor's bankruptcy schedules included numerous unsecured, non-priority creditors on the petition date, including Capital One Bank, Barklay's Bank, Citibank, Colonial Bank, Cowboys Card Services, Credit One, and First National Credit Card. The Debtor listed each of their claims as undisputed.

21. The Valks filed the following claims against the Debtor in his bankruptcy case: (i) Claim No. 31-1 filed by Ron Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud; and (ii) Claim No. 32-1 filed by Shawn Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud.

22. The Valks proofs of claim are identical. Their claims detail their allegations in the litigation they brought against the Debtor in 2018 in Texas state court for theft of labor, among other things. The litigation was pending when the Debtor filed for bankruptcy.

---

[3] The sale of TV Arrowhead's lake house closed on September 30, 2019, and the Chapter 7 trustee received net sales proceeds of $578,000.24 to hold in escrow pending a resolution of the ownership dispute with Shawn Valk. This Court subsequently approved a compromise and settlement agreement between the Chapter 7 trustee and Shawn Valk whereby the estate received $153,708.90 of the sales proceeds.

23. The Debtor's bankruptcy schedules and statements, and the claims filed in his case, show that several state court judgments were entered against the Debtor in the years leading up to bankruptcy. For example, the Debtor listed an undisputed, unsecured debt of $32,512.46 owed to Kevin Otto, which arises from a judgment entered in a lawsuit brought by Otto in 2014 according to the Debtor's SOFA. The Debtor also listed an undisputed, unsecured debt owed to Sheldon Snyder, which arises from a judgment entered in a lawsuit brought by Snyder in 2012 according to the Debtor's SOFA. Snyder filed Claim No. 39-1 against the Debtor in his bankruptcy case, which attached the state court judgment entered on October 18, 2018, in the amount of $88,217.39. And on August 19, 2019, a state court entered a final judgment against the Debtor in the principal amount of $174,926.70 in favor of Keith Black. Black filed Claim No. 34-1 in the Debtor's bankruptcy case. These judgments remained unpaid on the petition date.

24. On August 3, 2021, the Chapter 7 trustee filed a motion seeking approval of the sale of certain claims and causes of action to the Valks. As described in the motion, as amended, the estate held an interest in one or more claims or causes of action that had been asserted or could have been asserted in several lawsuits that were pending on the petition date as well as potential avoidance actions.

25. Ron and Shawn Valk offered to purchase all the estate claims and rights described in the Chapter 7 trustee's motion. In consideration for the estate's sale and assignment of its claims and rights, the Valks agreed to (i) pay the estate the sum of $50,000.00 and (ii) the subordination of the Valk proofs of claim to all allowed claims in the bankruptcy case.

26. Following a hearing on August 26, 2021, the Court approved the Chapter 7 trustee's sale motion over the Debtor's objection.

27. Ron and Shawn Valk subsequently initiated this adversary proceeding seeking to avoid and recover several allegedly fraudulent transfers made by the Debtor to his putative stepson, Escoffie, in the two years prior to bankruptcy. In addition, the Valks initiated proceedings seeking to recover alleged fraudulent transfers from: (i) the Debtor to his husband and his husband's business (Jose Doniceth "Doni" Escoffie and Copper Creek Distributors, Inc., Adv. Proc. No. 21-4106, for $158,807.43); (ii) the Debtor's other putative stepson (Alejandro "Alex" Escoffie, Adv. Proc. No. 21-4107, for $17,012.81); (iii) the Debtor's business (DFW Design & Remodeling, Inc., Adv. Proc. No. 21-4109, for $25,225.90); and (iv) the Debtor's friend and his friend's business (Darryl Briggs and Copper Creek Properties, LLC,, Adv. Proc. No. 21-4110, for $9,427.84).[4]

28. The present adversary proceeding against Escoffie does not involve any of the claims asserted in the Valk proofs of claim or any of the pre-petition litigation by or against the Debtor. Rather, in this adversary proceeding, the Valks seek to establish that the following transfers from the Debtor to his putative stepson were constructively fraudulent under § 548(a)(1)(B) of the Bankruptcy Code:

| **Deposit Date** | **From** | **To** | **Amount** |
|---|---|---|---|
| 3/13/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $510.45 |
| 3/20/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $651.60 |
| 3/27/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $592.80 |
| 4/3/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $626.85 |
| 4/17/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $720.00 |
| 4/23/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $700.00 |
| 5/1/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $600.00 |

---

[4] The Court tried this matter on December 7, 2022, as noted above. The Court separately tried Adv. Proc. No. 21-4106 on October 24, 2022, Adv. Proc. Nos. 21-4106 on December 6, 2022, and Adv. Proc. No. 21-4108 on December 7, 2022. Finally, the parties settled Adv. Proc. No. 21-4110 prior to trial.

| 5/7/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $250.00 |
|---|---|---|---|
| 5/14/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $630.00 |
| 5/21/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $699.90 |
| 6/5/2018 | Triplett d/b/a Preferred Platinum Construction - *6778 | Jose S. Escoffie | $587.25 |
| | | | **$6,568.85** |

## DISCUSSION

1.   Section 548 of the Bankruptcy Code provides for the avoidance of transfers made with the constructive intent to defraud as follows:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> ***
>    (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>       (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>       (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>       (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>       (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment ontract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

2.   Thus, to establish a claim for avoidance of a transfer as constructively fraudulent under § 548(a)(1)(B), the Valks must prove each of the following elements: (i) that the transfer was of an interest of the Debtor in property; (ii) that the Debtor made the transfers on or within two years before the petition date; (iii) that the Debtor received less than a reasonably equivalent

8

value in exchange for the transfers; and, inter alia, (iv) that the Debtor was insolvent on the date that the transfer was made or that the Debtor intended to incur, or believed he would incur, debts that would be beyond his ability to pay as such debts matured. The Valks bear the burden of proof by a preponderance of evidence on all elements of their claim for constructive fraud. *See, e.g., Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 436 (Bankr. S.D.N.Y. 2011).

3. Here, there is no dispute that the transfers to Escoffie involved an interest of the Debtor in property and were made within two years before the bankruptcy petition date. The remaining issues raised by the Valks are whether the Debtor received less than "reasonably equivalent value" for the transfers. *See* 11 U.S.C. § 548(a)(1)(B)(i). And if so, whether the Debtor was insolvent on the date of the transfers. *See* 11 U.S.C. § 548(a)(1)(B)(ii). If the Valks successfully meet their burden on § 548(a)(1)(B), the burden then shifts to Escoffie to establish an affirmative defense.

4. The Bankruptcy Code does not define the term "reasonably equivalent value" for purposes of § 548. Though "reasonably equivalent value" is not specifically defined, the Code defines "value" in purely economic terms, *i.e.*, "property, or satisfaction or securing of a present or antecedent debt of the debtor, but ... not ... an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A).

5. To determine whether reasonably equivalent value was provided, many courts have adopted a two-step process. First, a court determines whether the debtor received an economic benefit at the time of the transfers or obligations. *See Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1127 (5th Cir. 1993). Second, the value provided must be "reasonably equivalent" to what the debtor received. *See Think3 Litigation Trust v. Zuccarello et al.* (*In re Think3, Inc.*), 529 B.R. 147, 200 (Bankr. W.D. Tex. 2015). The second inquiry of

9

valuation is more difficult and is "inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter the challenged transaction." *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo),* 263 B.R. 214, 220 (W.D. Tex. 2000).

6. Here, the preponderance of the credible evidence at trial established that the Debtor received reasonably equivalent value for his transfers to Escoffie. Escoffie provided legitimate services to the Debtor and received reimbursement for legitimate expenses. Escoffie worked for the Debtor on construction projects in exchange for payments, like any other laborer, thereby allowing the Debtor to complete those projects and produce income for himself and his business. The Debtor reimbursed Escoffie for materials he purchased to complete certain projects. And Escoffie repaid the small, occasional loans the Debtor made to him.

7. Although the Court could end its discussion here, the Court will address the question of whether the Debtor was insolvent when he made the challenged transfers to Escoffie in order to provide a full discussion of the issues raised at trial.

8. The term "insolvent" is defined in § 101(32)(A) of the Bankruptcy Code as meaning "financial condition such that the sum of [the debtor's] debts is greater than all of such [debtor's] property, at a fair valuation" exclusive of property fraudulently transferred, concealed, or removed, and exclusive of property that may be exempted. 11 U.S.C. § 101(32)(A). "Courts refer to this as a balance sheet test, and engage in the 'fair valuation' of the debts and property shown on the debtor's balance sheet." *Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners, LLC*), 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re Lamar Haddox Contractor, Inc.,* 40 F.3d 118, 121 (5th Cir. 1994)).

9. Here, the Valks argued that the Debtor was "balance sheet insolvent" when he made the challenged transfers. The Valks drew this Court's attention to the Debtor's bank statements,

his credit card statements, his SOFA, and the damages various individuals were seeking from him in lawsuits. The Valks' argument, which only included assets in bank accounts and excluded non-cash assets such as receivables and the Debtor's interest in TV Arrowhead, is incomplete and insufficient to meet the balance sheet test for insolvency. However, the Valks established that the Debtor was not able to pay all his debts as they came due when he made the challenged transfers.

10. At trial, the Valks focused on the Debtor's liquidity, or lack of, to establish what they referred to as "balance sheet insolvency." The Debtor maintained balances on numerous credit cards. State courts had entered judgments exceeding $260,000 against the Debtor in 2018 and 2019, which he did not pay. The Debtor remained a defendant in several cases seeking, collectively, hundreds of thousands of dollars in damages against him when he filed for bankruptcy in September 2019. The Debtor had failed to pay all his federal income taxes for many years, and he owed more than $170,000 to the IRS on the petition date. Although the Debtor valued his interest in in TV Arrowhead at $325,000 in his bankruptcy schedules, the bankruptcy estate only received $153,708.90 from the sale of TV Arrowhead's lake house after settling the ownership dispute with Shawn Valk. Further, the Debtor's testimony that his claims against the Valks were worth at least $1 million was not credible and was undermined by the fact that the Chapter 7 trustee sold those claims and others to the Valks for $50,000 based on his business judgment.

11. The parties' joint pretrial order as well as the Valks' arguments about the Debtor's liquidity, raised the issue of whether the transfers to Escoffie were constructively fraudulent because the Debtor knew he was unable to pay all his debts when he made them. Even if a debtor's assets exceed his liabilities, a transfer may be constructively fraudulent if it is made with an intent or belief that subsequent creditors likely would not be paid as their claims matured. 11 U.S.C. § 548(a)(1)(B)(ii)(III). Section 548(a)(1)(B)(ii)(III) emphasizes cash flow and liquidity by providing

11

that a transfer for less than reasonably equivalent value is constructively fraudulent if the debtor "intended to incur, or believed that [he] would incur, debts that would be beyond [his] ability to pay as such debts matured." *Id.* "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." *In re WRT Energy Corp.*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001) (citations omitted).

12. Here, the Debtor's bank statements show that he moved large sums through his accounts each month.[5] The Debtor's bank and credit card statements also show that when he occasionally received large payments for his work on construction projects, he promptly used the funds to pay some of his personal and business debts. The Debtor, however, was accruing more debt than his income could pay. The Debtor maintained debts on numerous credit cards, and several large judgments were entered against him in the years prior to bankruptcy, which he did not pay. The Debtor failed to pay all his federal income taxes for many years prior to bankruptcy. The Debtor also was a defendant in several cases seeking, collectively, hundreds of thousands of dollars in damages against him when he filed for bankruptcy.

13. The Court finds and concludes that the Debtor did not reasonably believe he would be able to pay all his debts as they matured when he made the transfers to Escoffie. The Debtor, however, received reasonably equivalent value in exchange for the transfers to Escoffie, as discussed. Accordingly, the transfers were not made with the constructive intent to defraud.

---

[5] The Valks introduced into evidence several binders filled with bank and credit card statements for accounts belonging to the Debtor.

## CONCLUSION

For all the foregoing reasons, the Court concludes that the Valks failed to establish that any of the challenged transfers to Escoffie were constructively fraudulent under § 548(a)(1)(B) of the Bankruptcy Code. The Court will enter a separate judgment consistent with this Memorandum Opinion.

Signed on 03/31/2023

_____ SD
HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE